# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CLARENCE JOSEPH JASON,**<br>    **Plaintiff** | **CIVIL DOCKET** |
| **VERSUS** | **NO. 15-607** |
| **JAMES LEBLANC, ET AL.,**<br>    **Defendants** | **SECTION: "E" (5)** |

## ORDER AND REASONS

Plaintiff Clarence Joseph Jason filed suit against Defendants James LeBlanc, Robert Tanner, Shane Ladner, and Bradley Pierce, seeking vindication of his Eighth Amendment rights pursuant to 42 U.S.C. § 1983.[1] Before the Court is Defendants' renewed motion for summary judgment.[2] Defendants seek a judgment that they are entitled to qualified immunity on Plaintiff's claims. Plaintiff opposes the motion.[3] Defendants filed a reply memorandum.[4]

## BACKGROUND

This case involves the August 27, 2014 attack on Plaintiff Clarence Jason, an inmate at Rayburn Correctional Center ("RCC").[5] Plaintiff was attacked with a swing blade wielded by another inmate, Victor Cooper, who picked up the tool after finding it abandoned in the prison yard.[6] Plaintiff alleges Defendants Lieutenant Shane Ladner and Sergeant Master Bradley Pierce, in their individual capacities, violated his right to reasonably safe conditions of confinement when the Defendants provided inmates with

---

[1] R. Docs. 1, 22.
[2] R. Doc. 92.
[3] R. Doc. 97.
[4] R. Doc. 101.
[5] R. Docs. 1, 22.
[6] For a full discussion of the factual background, see the Court's September 25, 2017 Order and Reasons on Defendants' first motion for summary judgment. *Jason v. LeBlanc*, 2017 WL 4238709 (E.D. La. Sept. 25, 2017).

1

unsupervised access to tools that could be used as dangerous weapons.[7] Plaintiff also brings claims against Defendants Robert Tanner, Warden of RCC, and James LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections, in their individual capacities, for failing to train RCC officers.[8]

On December 27, 2016, Defendants filed a motion for summary judgment, asserting they are entitled to qualified immunity on Plaintiff's claims.[9] The Court was unable to determine the motion for summary judgment on the failure to protect claim because the second prong, deliberate indifference, could not be resolved at that time.[10] As explained by the Court, a prison official demonstrates deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety."[11] The standard outlined by *Farmer v. Brennan*[12] requires an evaluation of both the subjective knowledge and objective reasonableness of each Defendant and, as a result, the Court was required to consider the individual roles of each defendant in the disputed incidents.[13] Based on the summary judgment record, the Court found it was unable to determine whether Pierce and Ladner were deliberately indifferent. Because the extent of Pierce's and Ladner's training was disputed, the Court also was unable to rule on Plaintiff's failure to train claim against Defendants Tanner and LeBlanc. The Court denied the motion for summary judgment as to all Defendants without prejudice, and allowed discovery limited to the

---

[7] R. Docs. 1, 22. Defendants' motion to dismiss claims against them in their official capacities, R. Doc. 23, was granted on August 24, 2015, R. Doc. 26.

[8] In Plaintiff's opposition to the motion for summary judgment, he alludes to a separate claim against Tanner for a failure to supervise. Plaintiff's original complaint does not include a cause of action for failure to train or supervise. R. Doc. 1. Plaintiff's amended complaint adds only a cause of action for failure to train. R. Doc. 22.

[9] R. Doc. 51.

[10] R. Doc. 73 at 13-15.

[11] *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

[12] 511 U.S. 825 (1994).

[13] *Longoria v. Texas*, 473 F.3d 586, 592-93 (5th Cir. 2006).

relevant issues.[14] The Court allowed Defendants to refile their motion for summary judgment after the completion of the limited discovery.[15]

On March 20, 2018, Defendants filed a renewed motion for summary judgment.[16] Defendants again assert they are entitled to qualified immunity on all of Plaintiff's claims.

## LEGAL STANDARD

### I.   Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17] "An issue is material if its resolution could affect the outcome of the action."[18] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[19] All reasonable inferences are drawn in favor of the nonmoving party.[20] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[21] "A genuine dispute as to a material fact exists when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, a court determines that the evidence is such that a reasonable jury could return a verdict for the party opposing the motion."[22]

---

[14] R. Doc. 73 at 15.
[15] *Id.*
[16] R. Doc. 92.
[17] FED. R. CIV. P. 56.
[18] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[19] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[20] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[21] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).
[22] *Haverda v. Hays County*, 723 F.3d 586, 591 (5th Cir. 2013).

## II. Qualified Immunity

Defendants have moved for summary judgment that they are entitled to qualified immunity from suit.[23] "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[24] "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'"[25] As explained by the Supreme Court, "qualified immunity seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability."[26] In essence, qualified immunity "avoid[s] excessive disruption of government" by permitting officials to exercise their vested discretion without fear of civil liability."[27]

Typically, the movant on summary judgment bears the initial burden of demonstrating the absence of a material fact issue.[28] But "[a] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not applicable."[29] To defeat an assertion of qualified immunity, a plaintiff must "identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial."[30] "Conclusory allegations and

---

[23] R. Doc. 92.

[24] *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 391 (5th Cir. 2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

[25] *Id.* (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).

[26] *United States v. Lanier*, 520 U.S. 259, 570 (1997) (internal quotation marks and citations omitted).

[27] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[28] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[29] *Cass v. City of Abilene*, 814 F.3d 721, 729 (5th Cir. 2016).

[30] *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" are all insufficient to overcome immunity.[31]

## ANALYSIS

Plaintiff raises claims against Defendants Ladner and Pierce for violating his right to reasonably safe conditions of confinement by distributing dangerous tools to RCC inmates and failing to adequately supervise the inmates' possession and use of those tools. Plaintiff also brings claims against Defendants LeBlanc and Tanner for failing to properly train RCC officials. Defendants assert they are entitled to qualified immunity as to all of Plaintiff's claims. The Court will address each of these claims in turn.

## I.    Lieutenant Ladner and Sergeant Master Pierce

The Supreme Court held in *Farmer v. Brennan* that the Eighth Amendment imposes a duty upon prison officials to protect prisoners in custody from violence at the hands of other prisoners.[32] The Fifth Circuit, relying on *Farmer*, set forth the analysis to be followed when a prisoner's Eighth Amendment rights allegedly have been violated by a failure to protect resulting in an attack by a fellow inmate:

> It is well established that prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners. It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. A prison official violates the Eighth Amendment only when the inmate shows that (1) he was incarcerated under conditions the official knew posed a substantial risk of serious harm and (2) the prison official was deliberately indifferent to such risk.[33]

The Fifth Circuit has provided the standard for determining deliberate indifference in this context:

---

[31] *Orr v. Copeland*, 844 F.3d 484 (5th Cir. 2016).

[32] *Farmer*, 511 U.S. at 833.

[33] *Walker v. Upshaw*, 515 Fed. App'x 334, 338 (5th Cir. 2013) (internal citations omitted). *See also Longoria v. Texas*, 473 F.3d 586, 592-93 (5th Cir. 2006).

A prison official is deliberately indifferent to a risk when he knows of and disregards an excessive risk to inmate health or safety. To know of a risk, an official must be subjectively aware of the risk: that is, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This issue is a question of fact. Finally, even if a prison official was subjectively aware of the risk, he may be found free from liability if he "responded reasonably to the risk, even if the harm ultimately was not averted."[34]

The Court already has determined that the Plaintiff in this case was incarcerated

under conditions posing a substantial risk of harm:

In order to show a violation of his Eighth Amendment right, Plaintiff must first demonstrate that he was incarcerated under conditions posing a substantial risk of serious harm.[35] "Whether a risk is substantial and the threatened harm is serious represents an objective test[.]"[36] As explained above, "Several courts . . . have noted that the Eighth Amendment may be violated when prison officials permit inmate access to objects that could be used as weapons, especially when this conduct is accompanied by a lack of adequate supervision over the inmates."[37] In addition, similar to facts in *Goka v. Bobbitt*, "the risk to inmate safety from misuse of maintenance and other tools as weapons is evident on the fact of the tool control policy[.]"[38] Plaintiff attaches a copy of RCC's Tool Control Policy to his opposition to the Defendants' motion for summary judgment.[39] RCC's Tool Control Policy, which has the stated purpose of establishing "procedures that will ensure adequate control of tools," explicitly states that "[o]ffenders may only use certain tools," referred to as "Restricted Tools", "because of their potential security risk, within the fenced compound under *direct* supervision of staff."[40] RCC's Tool Control Policy further defines restricted tools as "implements that can be used to fabricate weapons, or that can be used as weapons; or that can be used to facilitate an escape."[41] Although the Tool Control Policy does not include a sling blade in its non-exhaustive list of examples of restricted tools, the Court finds that it is clear the sling blade used in the assault at issue is a paradigmatic example of a restricted tool pursuant to RCC's own policy.

As the sling blade at issue is clearly a restricted tool, RCC's own policy mandates that inmates only be allowed to use the tool when under direct

---

[34] *Anderson v. Wilkinson*, 440 Fed. App'x 379, 381 (5th Cir. 2011) (quoting *Farmer*, 511 U.S. at 844). *See also Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).

[35] *Anderson*, 440 Fed. App'x at 381 (5th Cir. 2011) (citing *Farmer*, 511 U.S. at 834).

[36] *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) (citations omitted).

[37] *Iwanski v. Oklahoma Dep't of Corrections*, 201 F.3d 448, 1999 WL 1188836 (10th Cir. 1999).

[38] 862 F.2d 646, 652 (7th Cir. 1988).

[39] R. Doc. 59-3.

[40] *Id.* at 1, 3 (emphasis added).

[41] *Id.* at 3.

supervision. Defendants argue that offenders working on the Wind Yard "are monitored via video monitors by the Unit Key Officer and Lieutenant using the camera outside of the buildings" and "a Lieutenant and Unit Key Officer periodically make rounds on the yard to assess the status of all of the offenders including those working inside the buildings and outside on the yard."[42] The Plaintiff argues it is clear there was no direct supervision in this instance. First, Plaintiff points to the affidavit of Darryl Mizell, the Chief Investigator for RCC, in which Mizell states there is no camera surveillance monitoring of the Wind recreational yard and that the surveillance cameras in place are only intended to prevent any escape and therefore are only directed at the perimeter fence.[43] In addition, Defendants admit that "After Sgt. Pierce issued the swing blade to offender Turner, he had no knowledge that offender Bernard Turner left his assignment or violated the prison disciplinary rules regarding the issued equipment." [44] Defendants also admit it is undisputed that "[w]hile the swing blade was unattended on the yard, another offender picked it up and used it to attack the plaintiff."[45]

Had there been *direct* supervision, as required by RCC's own Tool Control Policy, there would not have been an opportunity for an inmate to leave the swing blade unattended on the yard, leave the yard altogether, or for another inmate to pick up the abandoned tool and attack the Plaintiff. Since it is an undisputed [fact] that this occurred, the Court finds the prison did not follow its own policies with respect to the supervision of restricted tools and, thus, the Plaintiff has satisfied his burden in demonstrating that he was incarcerated under conditions posing a substantial risk of serious harm. [46]

The Court also has determined that swing blades are restricted tools under the Tool Control Policy.[47] The parties agree that the policy defines restricted tools as "implements that can be used to fabricate weapons, or that can be used as weapons; or that can be used to facilitate an escape."[48] It is clear that the list of examples of restricted tools is non-exhaustive.[49] The parties agree that the swing blade is described as flat, sharp metal plate, roughly three inches wide by twelve inches long, attached to a three-foot-long wood

---

[42] R. Doc. 51-1 at ¶¶ 8-9.
[43] R. Doc. 59-14 at ¶ 8 (citing R. Doc. 51-4, at ¶¶ 20-21).
[44] R. Doc. 51-1 at ¶ 34.
[45] *Id.* at ¶ 35.
[46] R. Doc. 73 at 11.
[47] *Id.* at 11-12.
[48] R. Doc. 92-8 at 4.
[49] *Id.* ("Some examples of restricted tools are . . . ").

stick.[50] The parties further agree that swing blades can be used as a weapon.[51] The Court therefore reiterates its holding that the swing blade fits the definition of a restricted tool under the Tool Control Policy.[52]

The issue remaining to be addressed as to the claims against Pierce and Ladner is whether these Defendants were deliberately indifferent to this substantial risk of harm.

With respect to this issue, the parties agree there are quite a few undisputed material facts:

- In August of 2014, Plaintiff Clarence Jason was an inmate at Rayburn Correctional Center ("RCC") in Washington Parish, Louisiana.[53]

- Plaintiff was housed in Wind Unit, a section of RCC that includes four inmate dormitories, a breezeway that runs between the dormitories, and a large open-air space referred to as the Wind Yard.[54] The Wind Yard is expansive, and includes a full-size football field, baseball field, basketball court, and other recreational spaces.[55]

- On work days, the Key Officer for Wind Unit chooses several inmates who have the appropriate work duty status, assigns each of these inmates a work area in the yard, and issues each of these inmates a specific yard tool—for example, a shovel, reel mower, or hoe.[56]

---

[50] R. Doc. 1 at ¶ 3.
[51] R. Doc. 92-11 at 114 ln. 25 – 115 ln. 6.
[52] Even if the swing blade is not a restricted tool under the Tool Control Policy, the analysis in this case would remain substantially the same. Clearly, a swing blade is a dangerous tool that can be used as a weapon. The Defendants either had subjective knowledge of the substantial risk of harm posed by a swing blade in the hands of an unsupervised inmate, or they should have had such knowledge because the risk was obvious, and yet they disregarded that risk.
[53] R. Doc. 92-1 at ¶ 1; R. Doc. 97-1 at ¶ 1.
[54] R. Doc. 92-1 at ¶ 28; R. Doc. 97-1 at ¶ 28. RCC has five discrete units: Rain Unit, Wind Unit, Snow Unit, Sun Unit, and Sleet Unit. R. Doc. 92-1 at ¶ 11; R. Doc. 97-1 at ¶ 11.
[55] R. Doc. 97-7 at 13 (Deposition of Shane Ladner).
[56] R. Doc. 92-1 at ¶ 19-20; R. Doc. 97-1 at ¶ 19-20.

- After asking for volunteers, the Key Officer selects the inmates who receive yard tools at random from the roughly 300 inmates who are put out into the Wind Yard.[57]

- The issuance of tools is governed by the RCC Tool Control Policy, the stated purpose of which is to "ensure adequate control of tools."[58]

- The policy governs the inventory and identification process for tools, and assigns various responsibilities to RCC officers.[59]

- The RCC Tool Control Policy includes a section on "Restricted Tools."[60]

- According to the RCC Tool Control Policy, restricted tools are "implements that can be used to fabricate weapons, or that can be used as weapons; or can be used to facilitate an escape."[61] Examples include axes, box cutters, files, and hacksaws.[62] Because of the potential security risk of issuing such tools to inmates, the policy mandates that "[o]ffenders may only use [restricted] tools . . . within the fenced compound under *direct supervision of staff*."[63]

- Swing blades are not expressly listed as restricted tools in the RCC Tool Control Policy.[64]

- The inmates who are issued tools keep them for approximately two to three hours at a time.[65]

---

[57] R. Doc. 97-1 at ¶ 21. *See* R. Doc. 92-11 at 59 lns. 3-15.
[58] R. Doc. 92-1 at ¶ 14; R. Doc. 97-1 at ¶ 14. *See* R. Doc. 97-4 (RCC Tool Control Policy).
[59] R. Doc. 97-4 at 4.
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.* (emphasis added).
[64] *Id.*
[65] R. Doc. 92-1 at ¶ 24; R. Doc. 97-1 at ¶ 24.

- On any given day, and on the day of the incident, the Wind Unit is assigned one Lieutenant Officer, a Key Officer, two Dorm Officers, and a Gate Officer.[66]

- The Lieutenant Officer is the supervisor over the entire Wind Unit, and makes several "rounds" throughout the unit during the day, but is not restricted to the Wind Unit premises.[67] On the day of the incident, Defendant Ladner was the Lieutenant Officer on duty.[68]

- The Wind Unit's Key Officer makes rounds all day throughout the entire unit, including the Wind Yard.[69] On the day of the incident, Defendant Pierce was the Key Officer on duty.[70]

- The Dorm Officers are assigned to work in the four dormitories, and do not conduct rounds on the Wind Yard.[71] Dorm Officers are able to view parts of the Wind Yard through the dormitory windows.[72]

- The Gate Officer has line of sight over the front portions of the Wind Yard.[73]

- There are cameras installed on several towers that monitor activity at the fence surrounding the Wind Unit.[74]

---

[66] R. Doc. 92-1 at ¶ 30; R. Doc. 97-1 at ¶ 29.
[67] R. Doc. 92-1 at ¶ 31; R. Doc. 97-1 at ¶ 30.
[68] R. Doc. 92-1 at ¶ 30; R. Doc. 97-1 at ¶ 29. It is unclear from the record where Defendant Pierce was during the assault on Plaintiff.
[69] R. Doc. 92-1 at ¶ 31; R. Doc. 97-1 at ¶ 30.
[70] R. Doc. 92-1 at ¶ 30; R. Doc. 97-1 at ¶ 29.
[71] R. Doc. 92-1 at ¶ 31; R. Doc. 97-1 at ¶ 30. *See also* R. Doc. 97-6 at 55 ln. 17 (Deposition of Bradley Pierce).
[72] R. Doc. 97-6 at 55 (Deposition of Bradley Pierce).
[73] R. Doc. 92-1 at ¶ 32; R. Doc. 97-1 at ¶ 31.
[74] R. Doc. 92-1 at ¶ 32; R. Doc. 97-1 at ¶ 31.

- No cameras monitor the area of the Wind Yard in which the attack took place.[75]

- On August 27, 2014, Defendant Sergeant Master Bradley Pierce issued a swing blade to inmate Bernard Turner to cut the grass on Wind Yard.[76]

- The swing blade consists of a flat, sharp metal plate, roughly three inches wide by twelve inches long, attached to a three-foot-long wooden stick.[77]

- At some point after Pierce issued the swing blade to Turner, Turner abandoned the tool in the Wind Yard.[78]

- No RCC officer was watching Turner when he abandoned the swing blade.[79]

- After Turner abandoned the swing blade, it was picked up by another inmate, Victor Cooper, who then beat Plaintiff in his head and back with it.[80]

- No RCC officer witnessed the attack.[81]

To establish these two Defendants were deliberately indifferent, Plaintiff must show (1) Pierce and Ladner both had subjective knowledge of the substantial risk of harm, and (2) both disregarded that risk.[82] "Whether a prison official had the requisite

---

[75] R. Doc. 97-9 at 3 (Answers to Interrogatories by Robert Tanner) ("There is no camera that videos the west side of Wind Yard where the initial attack happened").

[76] R. Doc. 92-1 at ¶ 6; R. Doc. 97-1 at ¶ 6.

[77] R. Doc. 1 at ¶ 3. The parties do not dispute Plaintiff's characterization of the tool.

[78] R. Doc. 92-1 at ¶ 7; R. Doc. 97-1 at ¶ 7.

[79] R. Doc. 92-1 at ¶ 10; R. Doc. 97-1 at ¶ 10. Pierce testified that, at the time of the incident, he had no knowledge that Turner had abandoned the swing blade. Further, it does not appear from the summary judgment record that any RCC official witnessed the abandonment of the tool or the events that immediately followed. *See* R. Doc. 92-5 (Affidavit of Major Darryl Mizell, RCC Chief Investigator).

[80] R. Doc. 92-1 at ¶ 2-3; R. Doc. 97-1 at ¶ 2-3.

[81] R. Doc. 92-11 at 83 lns. 6-10 ("We don't know what happened. We never did—were able to prove that Victor Cooper struck Clarence Jason with a tool—it's obvious somebody did—and, I mean I can't prove he did. But he did it.").

[82] *See Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).

knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]"[83]

Plaintiff points to competent summary judgment evidence showing that Pierce and Ladner had subjective knowledge of the substantial risk of harm. Defendant Pierce testified it was "foreseeable" that "the situation like what we're dealing with" could happen.[84] Pierce also testified that he had read the RCC Tool Control Policy, and was aware the Policy provided that "offenders may only use certain tools because of their potential security risk within the fence compound under direct supervision of staff."[85] Defendant Ladner testified that "[i]t's common for [offenders] to use anything they can get their hands on as a weapon, anything."[86] Ladner conceded that tools "could be used for assault," and prison staff "should always keep offender and tools in sight."[87] Indeed, Ladner's testimony emphasizes the fact that prison inmates can turn almost any object into a weapon, and that the vigilance of the correctional officers is essential to maintain inmate safety.[88] Ladner testified that he was familiar with the RCC Tool Control Policy, including its requirements regarding restrictive tools.[89] Based on the evidence before the Court, it appears likely that these Defendants had subjective knowledge of the substantial risk of harm.[90]

---

[83] *Id.* (quoting *Farmer*, 511 U.S. at 842).

[84] R. Doc. 97-6 at 15.

[85] *Id.* at 22.

[86] R. Doc. 92-11 at 107 lns. 5-7.

[87] *Id.* at 101.

[88] *Id.* It is not necessary to show that Defendants were aware of any risk specific to the Plaintiff, as the Plaintiff need not show that he was especially likely to be assaulted. *Farmer*, 511 U.S. at 843 ("[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."). Rather, Plaintiff need only show that the officials deliberately ignored a substantial risk to the safety of all inmates. *Id.* at 843-44.

[89] R. Doc. 92-11 at 111.

[90] At the very least, there are disputed issues of fact as to whether Ladner and Pierce had knowledge of the substantial risk of harm.

Even if Ladner and Pierce did not have subjective knowledge of the substantial risk of harm, "[a] factfinder may conclude that a prison official knew of substantial risk from the very fact that the risk was obvious."[91] In *Goka v. Bobbitt*, the Seventh Circuit considered a factually similar case.[92] An inmate had been assaulted by another inmate who was wielding a broom handle which he had been allowed to keep in his cell.[93] Under the tool control policy in effect at that prison, all tools were to be controlled by prison staff when not in use. The Seventh Circuit found that "the risk to inmate safety from misuse of maintenance and other tools as weapons is evident on the face of the tool control policy, which states that the primary purpose of the policy is 'to minimize the potential danger to facility security from the misuses of tools.'"[94] The same is true in this case. RCC's Tool Control Policy, which has the stated purpose of establishing "procedures that will ensure adequate control of tools," explicitly states that "[o]ffenders may only use certain tools," referred to as "Restricted Tools," "because of their potential security risk, within the fenced compound under *direct* supervision of staff."[95] The Court finds that, even if Defendant Pierce and Defendant Ladner did not have subjective knowledge of the substantial and obvious risk posed by handing out potentially dangerous tools to inmates without appropriate supervision, the risk was so obvious they should have known.[96]

The final issue to be determined is whether Pierce and Ladner were deliberately indifferent when they disregarded the known risk of harm. The Supreme Court has

[91] *Iwanski*, 1999 WL 1188836, at *2 (quoting *Farmer*, 511 U.S. at 842).
[92] 862 F.2d 646 (7th Cir. 1988).
[93] *Id.* at 648.
[94] *Id.* at 652.
[95] R. Doc. 92-8 at 1, 3 (emphasis added).
[96] In *Goka* the court denied summary judgment, finding that disputed issues of fact existed as to whether the defendants knew of the risk of harm and took any action to prevent it, and the extent of each defendant's knowledge concerning enforcement of the tool control policy. *Goka*, 862 F.2d at 652. At the very least, disputed issues of fact also preclude summary judgment on this issue in this case.

explained that a prison official disregards a known risk "by failing to take reasonable measures to abate it."[97] Defendants Ladner and Pierce rest their right to qualified immunity on their argument that there is "someone watching the inmates at all times" while the inmates are in Wind Yard and that this defeats a finding that either one of them disregarded the risk of substantial harm.[98] Defendant Tanner, the warden in charge of the facility, testified that the direct supervision required under the Tool Control Policy is "eyes on them,"[99] and that "for a restricted tool they need to be in sight."[100] To show that they were "watching" the inmates and, as a result, did not disregard the risk of substantial harm, Pierce and Ladner must show that an RCC official had a direct line of sight and was actually looking at all inmates while they used restricted tools.

Plaintiff bears the burden of establishing that there are contested issues of material fact with respect to whether Ladner and Pierce were deliberately indifferent. To meet this burden, Plaintiff argues that whether the Defendants met this standard while the inmates with restricted tools were in the Wind Yard is a disputed issue of fact. Plaintiff notes that "Defendants' testimony establishes that at any given moment, Defendant Pierce might be the sole officer indirectly supervising 300 inmates, some armed with tools that can be used [as] dangerous weapons."[101] Defendant Pierce testified that, as the Key Officer, he did not maintain a direct line of sight over all the inmates in the yard while he made rounds throughout the unit. When asked, "[y]ou didn't have a direct line of sight at all times, though?" Defendant Pierce responded, "No."[102] As the officer most directly

[97] *Farmer*, 511 U.S. at 847.
[98] R. Doc. 92-1 at ¶ 33.
[99] R. Doc. 92-9 at 78 lns. 5-6.
[100] *Id.* at 79 lns. 11-12.
[101] R. Doc. 97-1 at ¶ 30.
[102] R. Doc. 92-10 at 143 lns. 11-13.

responsible for monitoring the inmates in Wind Yard, Defendant Pierce's view of the yard would be critical to satisfying the Policy's mandate of "direct supervision" over inmates using restricted tools.

As noted above, the Wind Yard is quite large, and includes a full-size football field, a full-sized baseball diamond, and other recreational spaces.[103] It would likely be impossible for one officer to actually watch all the inmates with restricted tools while they were in the Wind Yard, and the assistance provided by other officers is far from clear.[104] Defendant Ladner testified that, as the Wind Unit Lieutenant, he is not restricted to the Wind Unit, and he would at times be "off-unit"[105] and, as a result, he could not have been in a position to observe the inmates in the Wind Yard. Defendant Ladner also conceded that "the two dorm officers are confined to the dormitory,"[106] and, as a result, the dorm officers could only see the Wind Yard through various windows. Ladner, in what appears to be self-contradictory testimony, testified "they might not have their eyes on that offender, but there is someone watching them at all times."[107] Ladner, in other deposition testimony, admitted that "there's not necessarily an officer there every minute."[108] The parties do not dispute that the Gate Officer has only line of sight over the front portions

---

[103] R. Doc. 92-11 at 51 lns. 8-20.
[104] Defendants' testimony suggests that RCC officers more closely supervised inmates in the recent past. As Plaintiff notes, until roughly four years ago, inmates worked during the day in the fields, and were directly supervised by gun guards. R. Doc. 97-1 at ¶ 84. Defendant Pierce explained that "[t]hey'd go out there to cut grass . . . [and officers would] walk[] around while they're cutting the grass—they're cutting the grass with swing blades—and you [would] have four gun guards that surround them." R. Doc. 92-10 at 13 ln. 21 – 14 ln. 9. Defendant Ladner testified that "[w]e used to have 60-something officers assigned to the field. Now we have three." R. Doc. 92-11 at 85. "In order to properly execute the sentence of hard labor, which is one of the duties of RCC, every offender [must have] a job to the extent possible." R. Doc. 51-3 at ¶ 32 (affidavit of Keith Bickham).
[105] R. Doc. 92-11 at 45 lns. 2-18 ("I might be escorting someone to this unit, or escorting someone to this unit, or coming up here to the control center to pick up something here, so, yes, anywhere on the compound.").
[106] R. Doc. 92-11 at 53 lns. 20-21.
[107] *Id.* at 101 lns. 16-19.
[108] *Id.* at 62 lns. 8-9.

of the Wind Yard.[109] The cited passages of the Defendants' depositions indicate, at best, that various staff members, assigned throughout the Wind Unit, have some line of sight over the inmates in Wind Yard at various times, and that these officers occasionally witness disciplinary infractions by inmates.[110] Ladner testified, pointing to locations on a photograph of Wind Unit, "you have officers stationed here (indicating), that can see all of this. You have officers stationed here that can see all of this. . .  you have this camera that is watching all of this, a camera here that's watching all of this . . . ."[111] This testimony does not establish that officers were watching all inmates with restricted tools in the Wind Yard at all times. The Court cannot see to which areas of the Wind Yard Ladner was pointing and the Defendants did not capture the meaning of his testimony by having him mark up an exhibit that was then attached to his deposition.

Defendants did not produce summary judgment evidence to show which portions of the Wind Yard can be seen from the dormitory windows or that the area in which the assault took place could be seen from them. Neither did Ladner or Pierce produce evidence that any of the Dorm Officers saw or could have seen Turner abandon the swing blade in the Wind Yard or the subsequent assault. Further, it is undisputed that cameras only monitor a portion of the Wind Yard, and that no cameras monitor the area in which the attack took place.[112]

Neither Pierce nor Ladner, nor any other officer, saw Turner abandon the tool, and no officer witnessed the attack on the Plaintiff.[113] It appears from the record that the

---

[109] R. Doc. 92-1 at ¶ 32; R. Doc. 97-1 at ¶ 31.
[110] R. Doc. 92-10 at 168 lns. 15-25; R. Doc. 92-11 at 104 lns. 8-18.
[111] R. Doc. 92-11 at 101 lns. 24 – 102 ln. 1-8.
[112] R. Doc. 97-9 at 3 (Answers to Interrogatories by Robert Tanner) ("There is no camera that videos the west side of Wind Yard where the initial attack happened").
[113] R. Doc. 92-1 at ¶ 10; R. Doc. 97-1 at ¶ 10.

assault was not discovered until Defendant Ladner discovered "a large amount of blood and a broken swing blade" on the Wind Yard.[114] Had there been "eyes on"[115] supervision of the inmates in the Wind Yard "at all times,"[116] as Defendants claim, a guard would have seen the abandonment of the tool and the assault.

Summary judgment in qualified immunity cases is appropriate only if the plaintiff fails to "identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof."[117] The Court finds the Plaintiff has established that there are genuine disputes of material fact with respect to whether there were RCC officials actually looking at inmates with restricted tools all times while they were in Wind Yard. Because Ladner and Pierce rest their right to qualified immunity on this assertion, which remains in dispute, the Court is unable to determine whether Ladner and Pierce took, or failed to take, reasonable measures to abate the risk of substantial harm presented by the use of potentially dangerous tools by inmates in the Wind Yard.[118] Accordingly, the Court denies summary judgment on the issue of whether Pierce and Ladner are entitled to qualified immunity.[119]

---

[114] R. Doc. 92-1 at ¶11; R. Doc. 97-1 at ¶ 11.

[115] R. Doc. 92-9 at 78 lns. 5-6.

[116] R. Doc. 92-11 at 101 lns. 16-17.

[117] *Orr v. Copeland*, 844 F.3d 484 (5th Cir. 2016).

[118] To be clear, the Court is not making a determination at this stage that the Defendants are not entitled to qualified immunity. The Court's ruling is that genuine issues of material fact preclude the Court from making such a determination.

[119] The Fifth Circuit has jurisdiction to review a district court's denial of summary judgment with respect to qualified immunity "only to the extent that the appeal concerns the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record." *Hamilton v. Kindred*, 845 F.3d 659, 661 (5th Cir. 2017) (quoting *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004)). The Fifth Circuit "lack[s] the power to review the district court's decision that a genuine factual dispute exists and instead consider[s] only whether the district court erred in assessing the legal significance of conduct that the district court deemed sufficiently supported." *Id.* (internal quotations omitted).

## II. Warden Robert Tanner

Defendants also move for summary judgment that Defendant Tanner is entitled to qualified immunity with respect to Plaintiff's claim that Tanner failed to properly train RCC officials on the use of dangerous tools by inmates. Officials are not subject to liability under 42 U.S.C. § 1983 for acts or omissions of their subordinates on the basis of respondeat superior.[120]  However, a supervisory official may be liable for a constitutional violation if (1) the supervisor failed to train the subordinate officer; (2) a causal link exists between the failure to train and the violation of the plaintiff's rights, and (3) the failure to train amounts to deliberate indifference.[121] To defeat qualified immunity, the Plaintiff must show that all three factors have been met or that disputed issues of material fact exist with respect to some or all of the factors.

The undisputed facts relevant to Ladner's right to qualified immunity are:

- Warden Tanner was involved in the drafting and revisions of the RCC Tool Control Policy.[122]

- The issuance of tools is governed by the RCC Tool Control Policy, the stated purpose of which is to "ensure adequate control of tools."[123]

- The policy governs the inventory and identification process for tools, and assigns various responsibilities to RCC officers.[124]

- According to the RCC Tool Control Policy, restricted tools "are implements that can be used to fabricate weapons, or that can be used as weapons; or

---

[120] *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001).
[121] *Id.*
[122] R. Doc. 92-1 at ¶ 15; R. Doc. 97-1 at ¶ 15.
[123] R. Doc. 92-1 at ¶ 14; R. Doc. 97-1 at ¶ 14. *See* R. Doc. 97-4 (RCC Tool Control Policy).
[124] R. Doc. 97-4.

can be used to facilitate an escape."[125] Examples include axes, box cutters, files, and hacksaws.[126]

- The Tool Control Policy mandates that "[o]ffenders may only use [restricted] tools . . . within the fenced compound under direct supervision of staff."[127]

- The Defendants produced Unusual Occurrence Reports ("UORs") involving assaults or altercations between inmates from 2007-2009 and 2011-2017 as well as the Disciplinary Reports involving aggravated fighting from 2010.[128]

- During the seven-year period prior to the assault on Plaintiff, there were no incidents involving assaults with yard tools.[129]

- During the seven-year period prior to the assault on Plaintiff, there were only four incidents in which an item issued for inmate work assignments was used in an assault—three incidents involving brooms, and one incident involving a mop.[130]

A.    <u>Failure to Adequately Train</u>

---

[125] *Id.* at 4.

[126] *Id.*

[127] *Id.*

[128] R. Doc. 92-1 at ¶ 34; R. Doc. 97-1 at ¶ 33. Plaintiff does not contest this statement of fact, but asserts that it is out of context. Plaintiff offers, "Plaintiff cannot confirm or deny whether Defendants in fact produced all of the UORs for the past ten years." R. Doc. 97-1 at ¶ 33. In his deposition, Deputy Warden Keith Bickham conceded that UORs are periodically deleted. *Id.*

[129] R. Doc. 92-1 at ¶ 35; R. Doc. 97-1 at ¶ 34. Plaintiff denies this statement of fact, but provides no evidence to dispute the truth of it. Plaintiff's objection is that, notwithstanding the lack of prior incidents, the risk of harm to inmates in the Wind Yard was "obvious and foreseeable." R. Doc. 97-1 at ¶ 34. This argument, even if accepted as true, does not create a dispute as to whether there were, in fact, prior assaults with a yard tool during the relevant time period.

[130] R. Doc. 92-1 at ¶ 36; R. Doc. 97-1 at ¶ 35. Plaintiff denies this statement of fact, but provides no record citations to summary judgment evidence to show there is a genuine issue of fact.

The first prong of the analysis asks whether the supervisor failed to adequately train the individual officers under his or her command.[131] "For liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective."[132] Further, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform."[133]

On this issue, the Court finds a genuine dispute of material fact exists as to whether Defendants Pierce and Ladner, as well as other RCC officials, were adequately trained on the supervision required when inmates are using dangerous tools in the Wind Yard. Defendants assert "CSM Pierce and Lt. Ladner both testified that they received regular, on-going training as to the RCC Tool Control Policy as well as many other RCC policies to ensure the safety and security of the inmates and the institution itself."[134] Defendant Ladner testified that "we train on tool policy year-round."[135] However, Plaintiff has submitted competent summary judgment evidence calling into question the training the officers received with respect to the supervision of the use of dangerous tools.[136]

Plaintiff relies in part on the training transcripts of Defendants Pierce and Ladner.[137] These transcripts reveal that in 15 years, Defendant Pierce received only 15 minutes of documented training related to "tools," and Defendant Ladner, in 24 years of service, received 5.5 hours of "tools" training, all prior to 2009.[138] Defendant Tanner testified that all training is documented.[139] As a result, if Ladner and Pierce had been

---

[131] *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).
[132] *Id.*
[133] *Id.*
[134] R. Doc. 92-1 at ¶ 25.
[135] R. Doc. 97-7 at 20, lns. 5-6.
[136] R. Doc. 97-1 at ¶ 25.
[137] R. Docs. 97-13, 97-14.
[138] R. Docs. 97-13, 97-14.
[139] R. Doc. 92-9 at 67, lns. 20-25 – 68, ln. 20.

trained on the Tool Policy or the supervision of inmates using dangerous tools generally, it is reasonable to expect that this training would have been documented in their employment records. Little or no training is reflected in the records and, in the event there was some limited training on tools, it is unclear what this training entailed, as Defendants could not produce any training materials, lesson plans, or other records documenting the content of the training sessions.

Plaintiff also asserts that Defendants' own testimony demonstrates that they were inadequately trained. For example, in his response to interrogatories, Defendant Pierce represented that he was "not aware of any training dealing with tools,"[140] and Defendant Ladner represented in his own response to interrogatories that he "can't recall any specific training regarding tools." [141] Further, the Defendants' depositions demonstrate their misunderstanding of the Tool Control Policy, suggesting that whatever training they did receive was inadequate to prepare them to implement the policy. For example, Defendant Tanner, the warden who drafted and adopted the policy, testified that he's "not the guy that decides that [certain tools] are restricted,"[142] and that the determination of which tools are restricted should be guided by "common sense."[143] In contradiction, Defendant Ladner stated that restricted status "is what is decided by the warden as restricted."[144] Moreover, Defendant Pierce's deposition suggests a troubling unfamiliarity with the RCC Tool Control Policy. Pierce is unable to articulate what types of tools would be considered "restrictive," how restrictive tools are identified, or who is responsible for making that

[140] R. Doc. 97-10 at 3.
[141] R. Doc. 97-11 at 4.
[142] R. Doc. 92-9 at 77 lns. 8-9.
[143] *Id.* at 77 lns. 5-12.
[144] R. Doc. 92-11 at 113 lns. 10-11.

determination.[145] Defendants also maintain different definitions of what constitutes "direct supervision." Defendant Tanner, who approved the policy, testified that "direct supervision" means "eyes on them."[146] Defendant Pierce, however, when asked whether his rounds in the Wind Yard qualified as "direct supervision, explained, "Well, direct supervision—I'm there. So, as long as I'm still moving, making the rounds, that's direct supervision, in my eyes."[147] Defendant Ladner testified that "as long as an officer can see [the inmates], that's supervision."[148] Ladner also testified there's "probably not" a distinction between direct and indirect supervision.[149]

In sum, the Court finds that the Plaintiff has established genuine disputes of material fact with regard to whether Defendants Ladner and Pierce were adequately trained on the supervision required over use of dangerous tools by inmates.

B.    Causal Connection

The second prong of the failure-to-train inquiry asks whether "a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights."[150] The Fifth Circuit requires the "failure to train be the 'moving force' that caused the specific constitutional violation."[151] The causal connection "must be more than a mere 'but for' coupling between cause and effect. The deficiency in training must be the actual cause of the constitutional violation."[152] Although "[t]he requirements of proof of inadequacy of training and causation are, in many respects, intertwined," a plaintiff must

---

[145] R. Doc. 92-10 at 137-147.
[146] R. Doc. 92-9 at 78 lns. 5-6.
[147] R. Doc. 92-10 at 143 lns. 7-10.
[148] R. Doc. 92-11 at 116 lns. 3-4.
[149] *Id.* at 116 lns. 18-20.
[150] *Hobart v. Estrada*, 582 Fed. App'x 348, 356 (5th Cir. 2014).
[151] *Valle v. City of Houston*, 613 F.3d 536, 546 (5th Cir. 2010) (quoting *Brown v. Bryan Cty.*, 219 F.3d 450, 461 (5th Cir. 2000)).
[152] *Id.* (quoting *Thomas v. Connick*, 578 F.3d 293, 300 (5th Cir. 2009).

submit "competent summary judgment evidence of [the] causal relationship between any shortcoming of the officers' training . . . and the injury complained of."[153] The summary judgment record must "put at issue whether additional training would have avoided the accident."[154]

As explained above, disputed issues of fact prevent the Court from determining whether a failure to train is established. Assuming the failure to train is established, however, Plaintiff has put forward sufficient evidence for a reasonable jury to find that the failure to train is causally connected to the violation of Plaintiff's right. According to their deposition testimony, Defendants Ladner and Pierce lacked basic knowledge about the RCC Tool Control Policy; the officers failed to articulate the policy's standards for supervision over the use of tools, and misunderstood what tools qualified as "restricted tools."[155] Based on the summary judgment record, a jury could reasonably infer that additional training on the RCC Tool Control Policy would have caused Ladner and Pierce to comply with the Tool Control Policy by providing direct supervision over the use of the tools in the Wind Yard, thereby averting the assault.[156] Accordingly, a reasonable jury could conclude that the lack of training constituted the moving force of Plaintiff's injury.[157]

C.     Deliberate Indifference

The third prong of the failure to train inquiry is whether the failure to train amounts to deliberate indifference. There are two ways to show deliberate indifference in

---

[153] *Pineda v. City of Houston*, 291 F.3d 325, 334 (5th Cir. 2002).
[154] *Id.*
[155] *See, e.g.*, R. Doc. 92-10 at 137-147; R. Doc. 92-11 at 116 lns. 3-20.
[156] Even if a swing blade is not a restricted tool under the Tool Control Policy, it still clearly can be used as a dangerous weapon, and training on the supervision needed for inmates using a swing blade likely would have averted the assault.
[157] *See Bryan County*, 219 F.3d at 465.

a failure to train claim. Usually, a plaintiff presents evidence of a pattern of similar violations resulting from the deficient training policy.[158] In the alternative, a plaintiff may establish deliberate indifference under the "single incident exception."[159] "This exception is narrow and requires proof that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation.

Plaintiff has not presented any evidence showing a pattern of similar violations at RCC. Plaintiff did not allege such a pattern in his complaint, and, despite Defendant's production of nearly a thousand pages of RCC incident reports, is not able to demonstrate a pattern based on the summary judgment record. Defendants submitted as undisputed facts that: (1) from at least as far back as 2007 until August 27, 2014, there were no prior assaults by inmates with a yard tool at RCC;[160] and (2) during the seven-year period prior to the assault on Plaintiff, there were only four incidents in which an item issued for inmate work assignments was used in an assault.[161] Although Plaintiff asserts that these facts are immaterial or lacking context,[162] Plaintiff nevertheless fails to submit any summary judgment evidence to dispute their truth. As a result, there is no evidence in the summary judgment record suggesting any pattern of yard-tool-related assaults as a result of the alleged training deficiency.[163]

---

[158] *Valle*, 613 F.3d at 547.

[159] *Goodman*, 571 F.3d at 395 (citing *Brown*, 219 F.3d at 457).

[160] R. Doc. 92-1 at ¶ 35; R. Doc. 97-1 at ¶ 34.

[161] R. Doc. 92-1 at ¶ 36; R. Doc. 97-1 at ¶ 35. Of these four incidents, three involved brooms and one involved a mop.

[162] R. Doc. 97-1 at ¶¶ 34-36.

[163] Plaintiff has complained about the Defendants' document production, and suggests that documentation may exist that would establish prior incidents of tool-related assaults. For example, Plaintiff points out that the Defendants previously provided Plaintiff with a "certification" signed by Deputy Warden Keith that RCC had no Unusual Occurrence Reports ("UORs") for inmate assaults involving weapons for the past ten years. Plaintiff subsequently filed a motion to compel, and Bickham admitted in his deposition that the certification was false because he had not actually looked for UORs for the past ten years. Defendants then

As Plaintiff has not introduced evidence of similar incidents, he must establish deliberate indifference under the single incident exception. As the Fifth Circuit has explained in the context of Fourth Amendment claims, "typically, application of the single incident exception requires evidence of the proclivities of the particular officer involved" in the specific incident or other evidence demonstrating that the constitutional violations would have appeared to the supervisor as a "highly predictable consequence" of the training deficiencies.[164]

The Fifth Circuit cases examining the single incident exception—ordinarily addressing Fourth Amendment claims involving the use of excessive force by an untrained officer—give little guidance with respect to the issues presented in this matter. For example, in *Brown v. Bryan County* the Fifth Circuit considered a claim that a sheriff had failed to train an inexperienced deputy, leading to the use of excessive force by the deputy against the plaintiff in violation of the Fourth Amendment.[165] In that case, the court found the jury could have reasonably concluded that it was obvious to the sheriff that his decision not to train the deputy would result in a constitutional deprivation, even though the plaintiff had not demonstrated a history of similar violations.[166] As later decisions have emphasized, the *Brown* court based its decision in part on the fact that the particular deputy involved demonstrated a proclivity for excessive force that put the

---

produced thousands of pages of UORs. Plaintiff maintains that the UORs produced by the Defendants may be incomplete, as "Bickham testified that UORs are periodically deleted and he 'just doesn't know how often.'" R. Doc. 97 at 15. Plaintiff states he "cannot rule out the possibility that UORs documenting prior incidents are missing." *Id.* The Court acknowledges that Defendants' failure to produce comprehensive records is troubling. Nevertheless, it is well-established that the burden of proof in a motion for summary judgment based on qualified immunity rests on the Plaintiff. *See, e.g., Kovacic v. Villarreal*, 628 F.3d 209, 211-12 (5th Cir. 2010) ("We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.")(quoting *Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir. 2001).

[164] *Hobart*, 582 Fed. App'x at 358 (quoting *Valle*, 613 F.3d at 549).
[165] 219 F.3d 450, 463 (5th Cir. 2000).
[166] *Id.*

sheriff on notice that training was necessary.[167] Such evidence of an officer's proclivity for use of excessive force has no relevance in the Eighth Amendment context when the plaintiff suffers violence at the hands of his fellow inmate, rather than by an untrained officer.[168]

The parties have not directed this Court to, and neither has the Court's own research identified, any cases in which the Fifth Circuit has examined the evidentiary requirements for the single incident exception in Eighth Amendment failure to train cases in which the failure to train results in an inmate-on-inmate assault. Cases from other circuits are somewhat helpful. In *Thomas v. Cumberland County*, for example, the Third Circuit reversed the district court's grant of qualified immunity on the plaintiff's § 1983 failure to train claim, finding that a triable issue remained as to whether the county exhibited deliberate indifference to the need for training of officers in conflict de-escalation.[169] The plaintiff in *Thomas* was an inmate who had been assaulted by another inmate.[170] The plaintiff had not put forward evidence of a pattern of similar constitutional violations, but the court found the "volatile nature" of the prison would make it more predictable that the need for such training would be apparent.[171] Because the circumstances that made an inmate-on-inmate assault likely were present, "the lack of training here is akin to a failure to equip law enforcement officers with specific tools to

---

[167] *See, e.g., Hobart*, 582 Fed. App'x at 358 (*Brown* involved "evidence of the proclivities of the particular officer involved in the excessive use of force"); *Valle*, 613 F.3d at 549 ("in the one case in which we found a single incident sufficient to support municipal liability, there was an abundance of evidence about the proclivities of the particular officer involved in the use of excessive force").

[168] Even in the Fourth Amendment context, the Fifth Circuit has left open the possibility that evidence unrelated to the proclivities of the officer involved may be sufficient to support a claim under the single incident exception. *See Hobart*, 582 Fed. App'x at 358. ("[O]ur case law does not absolutely require evidence of character traits or proclivities of the officer responsible for the single constitutional violation. . .").

[169] 749 F.3d 217 (3d Cir. 2014).

[170] *Id.* at 219.

[171] *Id.* at 225.

handle recurring situations."[172] The court applied the single incident exception because, as the Supreme Court noted in *City of Canton v. Harris*, "the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations."[173] As a result, the court in *Thomas* denied summary judgment on qualified immunity.

In the Eighth Amendment context, the single incident exception requires proof that Defendant Tanner "had sufficient notice" that the failure to train was "obviously likely" to lead to the violation of Plaintiff's rights."[174] This evidence must show the "training deficiencies must have been so obvious that the [constitutional violation] would have appeared to the [supervisor] a highly predictable consequence."[175] In this case, the Court finds a genuine dispute of fact exists with regard to whether the need for training is so obvious that the failure to train constitutes deliberate indifference. Defendants contend there is no evidence of subjective awareness of a risk of tool-related assault, arguing, "Warden Tanner testified that he was not aware of any issues with the policies and procedures as to the issuance, supervision, and control of yard tools at RCC."[176] Defendants misunderstand the analysis, however. In determining whether a risk was so obvious as to amount to deliberate indifference, the Fifth Circuit conducts an objective inquiry, asking whether "it *should* have been obvious [to the supervisor] that the highly predictable consequence of not training" his employees would be to cause Plaintiff's

---

[172] *Id.*
[173] *Id.* at 223 (discussing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).
[174] *Hobart*, 582 Fed. App'x at 357 (quoting *Brown*, 219 F.3d at 460).
[175] *Id.* (citations omitted).
[176] R. Doc. 92 at 7.

injury.[177] Based on the summary judgment record, the Court finds a reasonable jury could conclude the risk should have been obvious to Defendant Tanner.

The summary judgment evidence calls into question whether the RCC officers were adequately trained regarding the supervision over inmates using dangerous tools. As Plaintiff convincingly argues, "Defendants' testimony establishes that at any given moment, Defendant Pierce might be the sole officer indirectly supervising 300 inmates, some armed with tools that can be used as dangerous weapons, on a yard so big it includes a full-size football field, baseball field, basketball court, and other recreational spaces."[178] In a space this large, the lack of comprehensive "eyes on" or monitored camera surveillance appears to have left areas of the Wind Yard shielded entirely from RCC surveillance, at least at times.[179] Given these logistical difficulties, it would be essential for RCC officers to be trained on what "direct supervision" is required. At this point, the training Tanner required and provided on this topic for the officers under his command is in dispute.

Furthermore, as in *Johnson*, Defendant Tanner acknowledges the potential for violence among inmates in the Wind Yard is high.[180] It is undisputed that Defendant Tanner testified that the RCC Tool Control Policy was drafted to address the "obvious" risk that the inmates might use a yard tool as a dangerous weapon.[181] It also is undisputed that the tool policy itself recognizes that the use of dangerous tools by inmates poses a security risk because the policy requires "direct supervision" over those tools. [182]

---

[177] *Brown*, 219 F.3d at 461 (emphasis added).
[178] R. Doc. 97-1 at ¶ 31.
[179] R. Doc. 97-9 at 3 (Answers to Interrogatories by Robert Tanner) ("There is no camera that videos the west side of Wind Yard where the initial attack happened").
[180] R. Doc. 92-9 at 30 lns. 11-16.
[181] *Id.*
[182] R. Doc. 92-8 at 4.

Defendant Ladner testified that "it's common for [the inmates] to use anything they can get their hands on as a weapon, anything."[183] As a result, assuming all disputed facts in favor of the Plaintiff, a reasonable jury could find that the failure to train RCC officials on the RCC Tool Control Policy, or otherwise train them with respect to the supervision needed over inmates using dangerous tools, was "obviously likely" to lead to an assault. Accordingly, the Court cannot conclude that Defendant Tanner was not deliberately indifferent as a matter of law. This Court finds that a triable issue of fact exists in this case as to whether the risk of a tool-related attack created by the failure to train was so obvious as to constitute deliberate indifference. Accordingly, Defendants' motion is denied as to Plaintiff's failure-to-train claim against Defendant Tanner.

## III.    Secretary James LeBlanc

Once a Defendant properly invokes qualified immunity, "the plaintiff has the burden to negate the defense once properly raised." [184] In Plaintiff's opposition to Defendant's motion for summary judgment, Plaintiff fails to present any evidence whatsoever in support of its claims against Defendant LeBlanc. According, the Court finds Defendant LeBlanc is entitled to qualified immunity on Plaintiff's claims.

---

[183] R. Doc. 92-11 at 107 lns. 5-7.
[184] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). *See also Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

## CONCLUSION

For the foregoing reasons;

**IT IS ORDERED** that Defendants' motion for summary judgment with respect to Defendants Pierce, Ladner, and Tanner is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment with respect to Defendant LeBlanc is hereby **GRANTED**.

**New Orleans, Louisiana, this 13th day of June, 2018.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**